UNITED STATES, Appellee

v

L. C. DEMETRIS, Private First Class, U. S. Army, Appellant

9 USCMA 412, 26 CMR 192

No. 11,096

Decided June 27, 1958

*First Lieutenant Herbert R. Brown* argued the cause for Appellant, Accused. With him on the brief were *Colonel Edward M. O'Connell* and *Lieutenant Colonel W. H. Blackmarr.*

*First Lieutenant Avram G. Hammer* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel John G. Lee.*

### Opinion of the Court

GEORGE W. LATIMER, Judge:

A general court-martial convicted the accused of two larcenies of money and two larcenies of personal property, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921, and of wrongfully impersonating a commissioned officer by publicly wearing the uniform and insignia of a first lieutenant, in violation of Article 134, Uniform

**413**

Code of Military Justice, 10 USC § 934. He was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for three years. The convening authority approved only so much of the sentence as provided for dishonorable discharge, total forfeitures, and confinement at hard labor for one and one-half years. The board of review affirmed, after reducing those findings relating to thefts of personal property to lesser offenses of wrongful appropriation and the sentence to dishonorable discharge, total forfeitures, and confinement at hard labor for one year. This Court granted the accused's petition upon an issue relating solely to the offense of wrongful impersonation. The critical question is whether the law officer erred in not requiring the court-martial to find specifically that the accused knew he was wearing the uniform and insignia of an officer.

The accused was charged with the impersonation offense in the terms of criminality recommended in Form Specification Number 145, Appendix 6c, Manual for Courts-Martial, United States, 1951, which may be used to allege the greater offense involving an intent to defraud or a lesser offense without that mental condition. There was no allegation in this case of intent to defraud and hence the minor offense was pleaded, for which the maximum imposable punishment is a bad-conduct discharge, total forfeitures, and confinement for six months. Table of Maximum Punishments, paragraph 127c, Manual for Courts-Martial, supra. Accordingly, it would seem that the crime falls into the category of those requiring only a general criminal intent. Apparently for those reasons, the law officer gave no instruction, and none was requested by counsel, that any particular mental state must be found to have accompanied the accused's conduct.

In United States v Messenger, 2 USCMA 21, 6 CMR 21, however, this Court recognized a defini- tion of this offense, which required that an element of willfulness inhere in the impersonation in order for it to be criminal. Willfulness as used in this offense encompasses

a knowledge that one is falsely holding himself out as such and, generally speaking, a law officer should instruct on that ingredient if lack thereof is raised reasonably by the evidence. In this instance, we are willing to assume an evidential issue because, contrary to the defense contention, we find the court-martial was required to consider that very question.

The circumstances of this offense were integrated with those surrounding one of the wrongful appropriations. According to his trial testimony, the accused was under the influence of alcohol in the late afternoon of July 27, 1957, as he left his private residence attired in summer khaki uniform, minus the shirt. He drove off in his automobile, stopping at a drive-in restaurant where he donned a khaki shirt he had with him in the car. He admitted he had neglected to attach to the sleeves of this shirt the PFC chevrons his rank entitled him to wear. However, from that point on, until he found himself at about 10:00 p.m. that evening seated with his wife and daughter in a strange automobile at a drive-in theater, the accused claimed a lack of memory.

Before trial, the accused's capacity to remember was not so seriously impaired, for he voluntarily executed a pretrial statement—admitted into evidence without objection—which supplied missing details. Therein, the accused narrated what happened to him following his stopover at the drive-in restaurant. He states he drove to the vicinity of the King Pontiac Company, Columbia, South Carolina. Parking, he walked to the Company's used car lot, where a salesman induced him to buy a 1955 Chevrolet convertible. The salesman accompanied him to the office of the firm's credit manager, where he was asked for identification. He produced his Class A pass and a driver's license. He was asked what rank he held and replied that he was a private first class. He then formally entered into a contract of purchase for the car with the company, drawing a check for $800 on the First National Bank of South Carolina as a down payment. He admitted knowing at the time of the

414

transaction he had no account with that bank. He asserted the clothing he wore was a cotton khaki uniform and, to the best of his knowledge, the shirt had an enlisted man's insignia on the collar but he was under the influence of alcohol and may have had on first lieutenant's bars, though he did not then know he was improperly attired.

Employees of the King Pontiac Company, testifying for the Government at trial, verified the accused's pretrial account of his business transaction that afternoon with their company. However, they contradicted his extrajudicial story of what he was wearing that afternoon and of how he had identified himself to them. The credit manager and a salesman of the company testified he was wearing the silver bars emblematic of a first lieutenant on his left shirt collar and identified himself as such. The salesman, who happened to be a retired military police officer, also testified the accused was hatless and tieless and that he wore a military police officer's insignia upon his collar. Another witness, an enlisted man attached to the accused's organization, having seen the accused in Columbia, South Carolina, that day, corroborated this description. The credit manager also testified that the accused showed him a pass declaring himself a first lieutenant. The civilian witnesses testified to sobriety on the accused's part during their encounter with him that day.

Additional evidence of the accused's intoxication was presented in a stipulation that his wife, were she called as a witness, would testify the accused was drunk when he returned home on the night in question and that for months prior to that time he drank heavily at times because of his nerves; that very often when he was quite intoxicated it was very hard to tell he had been drinking; that in most of these instances he did not remember what happened; and that most recently almost every time he became drunk he would write checks.

As we previously stated, we are willing to assume the related evidence raised the issue of voluntary intoxication as negating the willfulness which the accused must have had to commit

the impersonation of which he was found guilty. United States v Simmons, 1 USCMA 691, 5 CMR 119. That, however, does not aid his cause, for the larceny he perpetrated against the King Pontiac Company was shown to have taken place simultaneously with the impersonation. In instructing on that offense, the law officer submitted to the court the question of determining whether, because of his intoxicated condition, the accused had sufficient mental capacity to entertain the specific intent to deprive the automobile company of its property. And there is no contention that the law officer's instructions upon this issue were incomplete. See United States v Higgins, 4 USCMA 143, 15 CMR 143. Therefore, the accused's defense of intoxication was rejected by the court when it found him guilty of larceny. United States v Kubel, 1 USCMA 645, 5 CMR 73; United States v Higgins, supra; United States v Leach, 5 USCMA 466, 18 CMR 90. It is inconceivable that the court could find the accused sober enough to be mentally responsible for the crime of larceny but sufficiently intoxicated to be mentally irresponsible for the offense of impersonation when the two occurred at the same time and place. A finding of sobriety on one necessarily compels a similar finding on the other. Accordingly, if there was error, it was harmless.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs in the result.

FERGUSON, Judge (dissenting):

I dissent.

I agree with the principal opinion that the question of knowledge was involved and should have been instructed on. I am unable to agree that specific intent, as affected by intoxication, is necessarily synonymous with the presence or absence of knowledge. Nor can I subscribe here to the theory of an instruction on one offense curing the lack of an essential item on another offense. Even assuming intoxication was the only question, I suggest one can

be intoxicated enough to be careless in his attire but not so intoxicated as to be deprived of the ability to form a specific intent.